MAUS V. V. ROSA, Appellant, *v.* JOHN BUTTERFIELD and others, Respondents: SAME *v.* SAME and others.

Where upon a loan of money to a corporation the defense of usury is unavailing to the corporation, it is also unavailing to its sureties.

Where a railroad company in this State gave its promissory note for the payment of $15,000, with twelve per cent interest payable semi-annually, *held*, that, in an action upon such note, the sureties thereupon could not interpose the defense of usury.

That by the statute of 1850 (ch. 172), the contracts of corporations borrowing money and agreeing to pay more than seven per cent interest, are legal and binding upon them; and that the guarantors of such contracts were liable upon their contracts of guaranty.

THESE are appeals from the General Term of the fifth district, affirming judgments entered on the reports of a referee. The defendants were sued as guarantors of two notes made by the Black River and Utica Railroad Company, a corporation organized under the laws of this State. The notes of the corporation were in the form following:

"$15,000. One year from date, for value received, the Black River and Utica Railroad Company promise to pay M. V. V. Rosa or bearer fifteen thousand dollars, at the office of the American Express Company, in the city of New York, *with interest at the rate of twelve per cent per annum*, payable semi-annually. Utica, July 7, 1856.

"JOHN BUTTERFIELD,
"President Black River and Utica Railroad Co."

The other note was for $10,000, payable fourteen months from date.

On the back of each of these notes was written an instrument in the following form:

"For value received, we jointly and severally guaranty to the holder of the within note the payment and also the collection of the same at all times unconditionally to the amount of its principal, viz., fifteen thousand dollars and interest on the same to the extent of seven per cent per annum; and guaranty also that said note is executed by the person or persons duly

authorized by the company to execute notes against said company, and in all respects according to the laws of the company. Utica,. July 7, 1856."

. These instruments were signed by the defendants respectively, as alleged in the respective actions. The notes and guaranties thus executed were delivered to plaintiff on the day of their dates, and he loaned thereupon to the corporation the sums of money named in such notes. The referee found that the negotiations for the loan were had shortly before the making of the notes between the plaintiff and. the defendants, and that it was agreed between them that plaintiff should make the loans to the company upon the terms and for the time set forth in said notes, upon the security of the company's notes guaranteed by the defendants, accompanied by the first mortgage bonds of the company as collateral security to the amount of $22,000 for the loan of $15,000, and $17,000 for the loan of $10,000; and that such loans were made upon the execution and delivery of said instruments and collaterals, and upon no other consideration. The first six months' interest on each note, at the rate of twelve per cent, was paid by the company.

The referee held the agreements or guaranties signed by the defendants void for usury, and gave judgments against plaintiff. These judgments were affirmed by the General Term on appeal, and the plaintiff appealed to this court.

*A. C. Paige*, for the appellant.

*F. Kernan*, for the respondents.

DAVIS, J. The notes of the corporation had no legal inception until their delivery to plaintiff. The defendants as guarantors occupied the relation of sureties of the corporation, and no liability attached to them until the notes became operative in plaintiff's hands by the consummation of the transaction between him and the company. Their contract with plaintiff in each case was the guaranty of the payment of a loan of money on which interest at the rate of twelve per cent had been stipulated for and reserved. It is of no moment

that their liability for the interest is limited to seven per cent, as it would be of none if it had extended to but part of the principal, or to that only with no interest.

If the notes be intrinsically usurious, and therefore viola-tions of the statute, the guaranties are necessarily so ; for they are coeval in their creation, and identical in their considera-tion. Though separate, they are by no means independent contracts. Unlike the guaranty of an existing contract, which may stand by itself, though the obligation guaranteed be invalid, these instruments must look for their consideration to that which upholds the notes, and when that fails through illegality, nothing remains to sustain any part of the transac-tion. In that view they are neither more nor less than collateral undertakings for the payment of a loan void by statute ; and, as part of the securities upon which the usurious loan was based, are infected with a vice that pervades and destroys the whole. The notes and guaranties were therefore plain violations of the statute against usury, and consequently void, unless preserved from this effect and consequence by the act of 1850. In my judgment these cases turn altogether upon the construction to be given to that act, and I refrain therefore from the consideration of any other proposition. The act of 1850 is entitled "An act to prohibit corporations from interposing the defense of usury in any action." The first section, which is the only one necessary to be referred to in these cases, is in these words :

"§ 1. No corporation shall hereafter interpose the defense of usury in any action." (Sess. Laws 1850, ch. 172, p. 334). Plain as the language of this section may appear to be, it is on its face suggestive of several constructions. In a strictly narrow sense, *to interpose a defense in an action* is to plead it or set it up by answer. In that sense the section would be construed simply to debar a corporation from thereafter plead-ing usury as a defense, thus reducing it to a rule of pleading, but operating effectively to prevent proof of usury under the settled rule which excludes the evidence whenever the fact is not pleaded. In that view it would apply only to pleas or answers thereafter to be interposed, and not to issues already

joined. But the courts have not hesitated to reject this construction, and to hold that to interpose the defense of usury within the meaning of the act was to set it up or insist upon it in any manner at any stage of the action; and so have rejected it as a defense on the hearing of appeals where it had long before been pleaded, and its effect on the case depended upon the application of the law to conceded facts. It was thus held to be retrospective; and to prohibit any step subsequently to its passage, by a corporation defendant, which amounted to an assertion of usury in defense of its obligations. (*Leavitt* v. *Curtis*, 15 N. Y., 9; *Southern Life, &c., Co.* v. *Packer*, 17 id., 51.)

Again: the language of the section speaks only of the interposition of usury as a *defense* to an action. In strictness this would leave the corporation free to use any offensive remedy which the law recognizes. For instance, to file its bill in equity to cancel the usurious agreement, and regain possession of any securities it had given; or to bring suit to recover back the usurious premiums it had paid; or to sue in trover for property or securities deposited as collaterals. But such a construction would defeat all the beneficial aims of the act, and usury would only cease to be a shield, to become the more obnoxious as a sword. The corporation forbidden to use it as a defendant, by instituting a suit as plaintiff, could under the former statute annul or wrest from the holder the very contract against which it could make no defense. Hence the courts were constrained to hold that since the enactment of this law, no corporation can maintain an action to invalidate its contracts on the basis of usury. (*Butterworth* v. *O'Brien*, 28 Barb., 187; *Hungerford's Bank* v. *Dodge*, per ALLEN, J., 30 id., 629; 17 N. Y., 51).

Again: By the letter of the act, corporations alone are forbidden to interpose the defense. But the assignees or representatives of a corporation should be regarded as within its spirit; and, therefore, the act is so construed that the receiver of a corporation, who represents both it and its creditors, and, as a general rule, may allege on behalf of the latter what the corporation is estopped from asserting, can neither defend

its obligations on the ground of usury (*Curtis* v. *Leavitt*, 15 N. Y., 230, 296), nor pursue and recover for the benefit of creditors the excessive interest which the corporation may have paid. (*Butterworth* v. *O'Brien*, 28 Barb., 187; 23 N. Y., 275.) In *Curtis* v. *Leavitt*, the question arose, whether this act was applicable to contracts made by corporations in foreign countries, and alleged to be usurious by the laws of such countries. The court unanimously adjudged that the act covered that class of cases. (15 N. Y., 296, prop. 8.) In *The Southern Life Insurance and Trust Company* v. *Packer* (17 N. Y., 51), this court, with the same unanimity, held that foreign corporations, prosecuting in this State to procure an account and restitution of the proceeds of certain securities assigned in 1840 and 1841, in New York, upon usurious loans obtained for the benefit of the corporation, were within the provisions of the act of 1850, and could not sustain the suit after its passage.

These various interpretations of the act very clearly show that it is regarded as remedial in its nature, and entitled to a liberal and beneficent construction; but none of them have directly touched the fundamental question of these actions. To what extent they have incidentally passed upon it, I shall endeavor hereafter to point out.

In my judgment, the question on which these cases depend is, whether the act of 1850 has operated to make lawful the contract of a corporation for the loan of money to itself, which would otherwise be usurious. If it stops short of that effect, and leaves the contract still obnoxious to the vice of usury, though the corporation itself and its privies in estate are interdicted by statutory estoppel from saying so, I see no sound reason why the defendants may not assert the fact in their own defense. To make the contract lawful, the act must be held either to have effected a repeal of the usury laws as to the borrowing contracts of corporations, or to have made such contracts an exception to the operation of those laws. Rightly to consider this question, it is essential to apprehend the legal nature of usury. Usury is not now regarded as a crime in itself, or *malum in se*. Both as an offense against

the laws and a defense to suits in court, it is dependent upon express statutes. As a defense, it is not founded upon any common law right, either legal or equitable; and it is clearly within the power of the legislature to take it away. (Per. SELDEN, J.; *Curtis* v. *Leavitt*, 15 N. Y., 254.) Our statute creates the defense in two ways: first, by declaring that "no person shall directly or indirectly take or receive, in money, goods, or things in action, or in any other way, any greater sum or greater value, for the loan or forbearance of any money, goods, or things in action," than at the rate of seven per cent, and declaring the act of doing so a misdemeanor, punishable by fine and imprisonment; second, by declaring void all contracts and securities whatsoever taken on such loan or forbearance, and authorizing the borrowing party to assail or defend them. (3 R. S., 5th ed., 72, 73.)

On the first of these provisions the defense arises out of the settled principle that courts will not enforce contracts which are offenses against the law; on the second, because the statute having declared the contract void, no legal liability or obligation can spring out of it.

Upon these provisions of the statutes the legislature has engrafted another, which, as the later expression of its will, is of superior potency, declaring that no corporation shall assail or defend its contracts on either ground of these statutory provisions. Now, as there is no defense or offense except through those provisions, is it not a logical and necessary consequence that the vice which constitutes them does not exist under the law in respect to such contracts? If the law which creates the taint declare that it shall not be alleged to exist as to a certain class of contracts, or be asserted by a certain class of persons to annul their contracts, is not this quite equivalent to saying that those contracts are free from this taint, and outside of its consequences? Properly collated, the statute becomes, in substance, that no person shall take usury, and all contracts which take or secure it shall be void; but no corporation shall ever allege usury to defeat its contracts. This, it seems to me, would be equivalent to declaring that the contracts of corporations shall not be subject to the pro-

visions of this statute. If the statute had originally been framed with the act of 1850 incorporated in its restraining sections, it seems to me it would have been adjudged to have created an exceptional class of contracts not within or obnoxious to the offense of usury.

The ingenious and able counsel for the respondents brings this question to the true test, when he insists that the act of 1850 operates upon the corporation *in personam*, and not upon the contract it has made ; that its effect is spent when it restrains the corporation and its legal successors from raising the objection of usury, leaving the contract to be what the statute against usury declares it, and the rights of all other persons unaffected by the merely personal prohibition. But, if this be so, then it is still a crime under the law for any one to loan money to a corporation for more than seven per cent, and receive the stipulated rate. Section 6 of chapter 430 of the Laws of 1837 declares the act of receiving usury to be a misdemeanor, punishable with much severity. But all agree that the lender may recover by suit against the corporation, *by force of the act of* 1850, both the principal and the excessive interest. So, then, it would follow that the law would convict the lender and punish him for the crime of receiving what, through its courts, the law had solemnly adjudged to him. It is submitted that no such anomaly exists. So, if the act of 1850 be a mere personal prohibition, it is not perceived why the provisions of the statutes authorizing a party to recover back the usurious premium paid, or, in case of his default to sue in one year, empowering the overseer of the poor to recover it within three years, are not in full force as to corporations. It is one thing to defend or set aside a contract for usury, and quite another to recover back a usurious premium under the statute. The latter may be done after the contract has been paid up and fully discharged, leaving nothing in it either to defend or assail ; or it may be done especially by the overseer of the poor, where the contract is never impugned by its parties. Why, then, may not a corporation pay up its usurious agreement, and afterward recover back the usury ? The voluntary nature of the payment would

be no answer to the statute. But this is the very thing which the Supreme Court, in *Butterworth, Receiver,* v. *O'Brien* (28 Barb., 187,) held could not be done; and this court, by affirming that judgment, without concurring in the reasoning of the learned judges who pronounced the opinions, may be regarded as having settled the question with peculiar emphasis. (23 N. Y., 275; reporter's note, 281.) That decision, I think, is sustainable only on the ground that the contract to loan money made by a corporation is no longer usurious; and I should regard it as having determined the question now before us, but for the declension of the court to meet it, as shown by the foot-note of the reporter.

The loss which the law imposes on the usurer by avoiding the contract, is in the nature of a penalty. The act of 1850, regarded in the light claimed by respondents, prohibits the corporation from taking the benefit of the penalty; but considered as a mere personal prohibition it must stop there, and cannot affect penalties to which other parties, and especially the people, are or may be entitled. Again, if the contract be still usurious, why is not the plaintiff indictable under the section above referred to, for having received the excessive interest on the first semi-annual installment? But to such an indictment, would it not be a complete answer that the money received was no more than the law authorized him to collect, and would, by suit, have adjudged to him?

In *Curtis* v. *Leavitt,* the act of 1850 received an attentive consideration at the hands of several of the judges. What may be said to have been decided in respect to it by that case is stated in the eighth of the several propositions adopted by the court (at page 296), in these words:

"Even if the said loans upon the four hundred and ninety-nine bonds were usurious, the appellant as receiver representing as he does the corporation, is prohibited by the statute of this State, passed in 1850, ch. 172, from setting up the usury in those cases in any stage thereof."

It is unmistakable that this decision was reached upon the idea that the act of 1850 operated as a partial repeal of the usury laws of this State.

"My impression is," said COMSTOCK, J., "that the act must be construed as a repeal of the statutes of usury as to all contracts or corporations stipulating to pay interest, thus leaving the contracts in full force according to their terms, and that such an act is liable to no constitutional objection." (15 N. Y., p. 85).

BROWN, J., (at page 154), in language more explicit and emphatic, said " The effect of the act of April, 1850, is to repeal the statute of usury so far as it applies to corporations, the condition of this class of contracts becomes the same as if the usury laws never existed.   *   *   *   The barrier wall, the place of strength which the usury laws set up between the lender and the borrower, is thrown down and leveled with the ground, whenever the borrower is a corporation.   Henceforth the law offers no rewards for bad faith and broken promises to this class of contractors."

PAIGE, J., (at page 229), says: "The act of 1850 is in substance a repeal of the statutes of usury so far as relates to corporations.   The language as well as the spirit of the act applies to antecedent as well as subsequent usurious agreements."

The argument of the learned judges through which this conclusion was reached is, in brief, that the forfeiture of the debt under the usury statutes is in the nature of a penalty; that the repeal of a law giving a penalty carries with it the penalty itself where no fixed right to it had previously been established by adjudication, or no reservation of it made in the repealing act; and that a borrower had no such right to allege the usury in his contract, as deprived the legislature of power to repeal the law giving the defense of usury.

The case does not in my opinion decide that the usury laws were repealed as to the contracts of corporations stipulating to pay interest, by the act of 1850; nor does the eighth proposition necessarily involve that result; but the quotations I have made show that such was the opinion of several very able jurists of that court.

We are referred for the intention of the legislature in enacting the law under consideration, to the reports of committees

of that body, and more particularly to the report of Senator George R. Babcock, himself an able lawyer, showing that he regarded it as a repeal *pro tanto* of the usury laws. But I think our duty requires us to seek the construction of the act in the language of the enactment; in the provisions of the statute which it was designed to affect; in its necessary operation upon them, and the scheme or system of policy they had created; and in the mischief it was intended to remedy or prevent.

If one object of the act was to enable corporations to borrow money more readily for the purposes of their business, then certainly it was essential that the contracts made by them should be of such a character as to be valid both as to principal and sureties; otherwise 'this object might be defeated by the inability to give collateral undertakings which should be free from the taint of usury.

The form of the act, out of which all the discussion arises, it seems to me, is easily explicable. Had the act simply declared that the usury laws were repealed so far as they affected the contracts of corporations, or that the contracts of corporations should be excepted from the provisions of those laws, the whole mischief would by no means have been reached and remedied. A repeal of our laws would have had no extra-territorial effect; and so a New York corporation that had borrowed money in England, or elsewhere, on a contract governed by foreign laws, would have been able to interpose and prove such laws as a defense, notwithstanding our own were repealed as to similar contracts made in this State. It was important therefore to adopt some form of enactment which would wholly uproot the mischief against which it was aimed. The act of 1850 accomplished that purpose; for while it made valid the contracts of corporate borrowers in this State, whether domestic or foreign, by constructively repealing our usury laws as against them, in a form which operated both retrospectively and in future, it also debarred all corporations from alleging usury in the courts of our State, no matter where their contract was made, or by what *lex loci* it was to be governed. The act both repeals and prohibits; and there-

by reaches a common result as to all *contracts* within its scope; as to domestic, by removing the ground of illegality; as to foreign, by shutting out, in our courts, a defense which it could not otherwise abrogate.

My conclusion is that the notes of the railroad company were not usurious, but were enforceable against the company upon their intrinsic validity; that the defendants are guarantors of lawful contracts, and therefore liable upon their guaranties; and that the judgments below should be reversed, and new trials ordered, with costs to abide the event.

All the judges concurring,

Judgment reversed.